Please the court. My name is Kim Alvarado. I'm an attorney for Pamela Brock and Randall McLaws. I'd like to reserve five minutes of my time for rebuttal. I'll try and help you. Okay. And I'll just keep an eye on the clock myself there. Very well. As you know, this is an interlocutory appeal in which the district court denied qualified immunity to the two officers on the plaintiff's Brady claim. I believe that the Supreme Court's recent decision just four months ago in Stanton v. Sims really dictates this Court's analysis of the clearly established prong of the qualified immunity test. Obviously, this Court can decide the case on either prong of the qualified immunity test, and both arguments were presented to the district court, and both arguments were presented in our opening and brief. Alito And Ms. Alvarado, just so I'm clear here, what is it that you contend was not clearly established back in, I guess it was 2000, what was the date? Alvarado 2000 and 2001. Alito Yeah. So 10, 15 years ago? Alvarado Yeah. The first incident occurred in September 2000. Ms. Jernigan's criminal trial was in March of 2001. There are many things that are not clearly established. First of all, even the, just the Brady violation that the Ninth Circuit on bank ultimately found in 2007 was not clearly established in 2000-2001. Obviously, there was a tremendous disagreement between the judges on that issue, both from the original panel in 2006 and the on bank panel in 2007. Neither one of those were majority unanimous decisions. Alito Is that because there's a question as to whether or not these local police detectives were members of the federal prosecution team? Because it seems to me that the law has been established for some time that the Brady obligation is not unique to the prosecutor. It also extends to the case agent and the federal agencies that are involved in the prosecution. Well, a couple of things. I think the disagreement in the two published Jernigan cases wasn't dealing with where the obligation lies. It was simply trying to find out whether the evidence of the other crimes, the November 2000 robberies, was material at all. And there was tremendous debate amongst the Ninth Circuit about whether it even met the materiality prong to rise the level of a Brady violation. And that was based on Judge Carroll's finding at the trial court level that the two women did not look alike. Correct. Judge Carroll ruled that he would not have admitted the evidence of the, at that time, unsolved November 2000 robberies. He would not have admitted them into the trial. And there was no contention, as I understand it, having read the Jernigan and bank opinion by defense counsel, that the two women looked alike. Correct. The defense counsel did not claim that they looked alike. So your argument is that until Judge Fletcher wrote our in bank opinion in, what was the date? 2007. 2007, which is now law of the case, that this was material, that the officers would have had no notice that in 2000 and 2001 that they had any obligation at all. Correct. That's one prong. Then the second, then there's multiple things that are not clearly established. My concern about that prong is it's clearly established, I would assume, that if something's material, it has to be given to the defense. We'll forget the intermediate issues here. So that what was not perhaps clear is whether in this particular case this item of information was material, which would be a different level of not clearly established. So it's just like it's clearly established, you can't use excess force. But until we have some decision, it's not clearly established that the use of a taser or some other device is automatically excess force. Absolutely, Your Honor. And in fact, even in the district courts, in this case, Judge Snow's opinion, the cases that he cited for the clearly established are criminal cases in which other And so based on the fact that either it's not material or some of those cases were Rule 404B cases, they're not even other crimes of other people cases. They are other acts of the defendant that the government was trying to admit. And in many of those cases, that subject of evidence was excluded. So I think under the Stanton v. Sims case that just came out four months ago with a unanimous precarium opinion from the U.S. Supreme Court, that case actually disapproved of the Ninth Circuit using case law in which the constitutional, the alleged constitutional violation, it was actually ended up being approved. The U.S. Supreme Court said you can't use that case law to establish that something is clearly established. They actually criticized the Ninth Circuit for relying on a U.S. Supreme Court case of Santana in which the, in that case, the officer's warrantless, warrantless entry in hot pursuit was approved. And the Ninth Circuit had cited that case to, in this Stanton case, to say, well, it was clearly established back then. The Supreme Court said you can't use case law that approves of the exclusion or approves of the act to somehow argue that something is clearly established. And that's exactly what the district court in this case did at pages 27 through 20, excuse me, 26 through 27 of his opinion. The other thing that is not clearly established is, again, we're talking about in this case police officers who respond to a 911 call, do their reports, turn them in, and after that point the FBI takes over. These police officers are not involved in the prosecution. The one police officer, Officer Brock, is simply, she's subpoenaed to testify. She's subpoenaed by the defense to testify at trial. And so she responds to the subpoena. But these are not the case agent. They're not the person sitting at the trial, at the table with the government's lawyer, with the prosecutor, who's going to know what are the charges? What's the evidence? What's the defense? What makes Jarnigan, the published cases in 2006 and 2007 unique is that those cases, if you look at their opinion, it doesn't cite a lot of other case law to say, oh, our case law, our analysis is dictated by this other decision. It simply cites the General Brady cases, what they stand for, materiality, and then it goes into a very detailed analysis of what the evidence was at trial, what the charges were, what her defense was. My two police officers have no involvement with that. They're just the guys who get there at the beginning, file reports, and they turn them in. Well, it's a little more than that. I mean, Detective Brock did accompany Special Agent Keith Richards when he went back and re-interviewed the victims of the first bank robbery. So is it your position that the record is clear that Brock was not notified of Jarnigan's arrest and interrogation by Richard until he asked her to accompany him on those re-interviews shortly before trial in 2001? Correct. She testified that she had no knowledge or notice of Ms. Jarnigan being arrested. And she yes, and she testified she was never aware of what the charges were, anything like that. She simply, when the FBI calls and says ---- Well, I thought didn't she ---- I thought they obtained a Federal arrest warrant on the basis of the September 29, 2000 robbery, which was her case locally. But she didn't put in an affidavit or anything in that regard. So it was Agent Richard relying on the Gilbert police reports and the FBI reports who presented the affidavit in support of the complaint and the arrest warrant? Correct. I mean, what happens is you call 911. Obviously, the local jurisdiction shows up first. And then the FBI gets there. We understand all that. We've read the record. We've read your cases. I guess the difficulty we're having here is there's concurrent jurisdiction. It's an armed robbery under Arizona law. It is the robbery of a federally insured financial institution under Federal law. And as I understand it, there's some kind of an MOU between the FBI and local law enforcement agencies that unless you make an on-view, in-progress arrest of the bank robber, the FBI takes over the investigation and prosecutes. Weapon was involved, things like that. Right. But in this case, we've never taken the position that the town of Gilbert couldn't have filed State charges against the perpetrator. They just didn't. Right. And they never intended to. She never sent a prosecution package to the Maricopa County prosecutor saying please file State armed robbery charges against Ms. Journey. Correct. And all their declarations are uniform in saying we had no intention of ever doing  We basically were doing nothing because the FBI came in and the FBI said they were going to pursue charges in this case. And so we're not. I mean, it's just that simple. And am I correct that to the extent that Agent Richard was engaged in some kind of briefing of Phoenix area law enforcement agencies, that Gilbert detectives did not participate in those briefings regarding all six of the robberies? There's no evidence that any Gilbert detectives ever went to those meetings, were ever briefed at any of those meetings, or that this particular robbery was ever discussed at those meetings. This is simply Mr. Richard testifying about what was sort of a standard practice at the time. And am I also correct that Sergeant McLaws testified on deposition that to this day he doesn't know when Ms. Jernigan was arrested? Correct. Until he got served with this civil lawsuit, he had never even heard of anything regarding this case. He didn't know she had been arrested, tried, overturned. He doesn't follow Federal cases that he has no involvement with. Okay. You wanted to save five minutes. Yes. And I just want to make one quick point before I sit down. Another thing about the Stanton case that I think is very important from the Supreme Court's unanimous voice just four months ago was saying that that court said you have to have an unequivocal statement of controlling authority or a robust consensus of persuasive authority that lays down a categorical rule in order for something to be clearly established. What I thought was interesting was they then, again, the Ninth Circuit relied on a Supreme Court case called Welsh. And in Welsh, the warrantless entry of that case in that particular circumstance said it should be rarely sanctioned. Now, as an attorney, I would, if the Supreme Court case said something should be rarely sanctioned, I would rely on that probably to argue that something is clearly established. And the Supreme Court just four months ago said no. That just because we said something is rarely sanctioned, that's not the same as saying that the entry would never be justified. We didn't lay down a categorical rule. Therefore, the Welsh opinion was equivocal and it's not sufficient to establish that the law was clearly established. That same type of analysis should apply in this case when we don't have any controlling authority, let alone a robust consensus of persuasive authority. Thank you. Very well. Thank you. We will hear from Counsel for Ms. Jurnian. Good morning, Judge Talman, Judge Rawlinson, Judge Jarvis. Good morning. My name is Tom Barham. I'm here representing Rachel Jurnian. I presume we've already gotten by the jurisdictional issue based upon your questions. So I'll go to the argument that Ms. Jurnian raised. And I guess it in your remarks is it seems to me that your case against the local detectives as opposed to FBI agent Richards relies very heavily on a lot of inferences based on how closely these detectives were housed in the trailer in order to establish the elements of your prima facie claim that there was deliberate indifference here in part because they knew that Jernigan had been arrested and therefore couldn't have committed robberies 4, 5, and 6. So could you address essentially what's your evidence in support of your basic claim here? If you go to Excerpt of Record 396, this is Brock's report from February 14th, 2001. And she states, this is the middle of the page, Crime bulletin was immediately completed using photographs obtained from the surveillance video and the witnesses' victims' statements. Then the significant passage. The bulletin was electronically sent to valley agencies for alert information purposes and then it goes on. Okay. So she tells the rest of the world we had a bank robbery on September 29th. This is how things work in the real world. As you're a former prosecutor, so is Judge Robinson. And a former defense lawyer. I've been on both sides of this issue. And Judge Garbus is a lawyer of many, many years on the trial. And also a former defense lawyer. So you're talking to a very experienced panel here that's been in the trenches. So this isn't news to any of you. Right. The police, how the police operate is you transfer this information to other agencies. Now, our evidence at trial, presuming that we get there, is going to be, ladies and gentlemen of the jury, this is how things are done. You communicate this M.O. information. You communicate the person's image, poor as it may be. But the reciprocal is true also. When Robbery 2 occurs in Tempe on 1011 and there's a getaway car of a dark Toyota and you have almost a virtually identical description, and then Robbery 5 occurs in Mesa on November the 30th, the getaway car is a black Toyota with a special trim, you've got almost these identical descriptions. Now, do you suppose that you can do that? I'm sorry. I must have missed it in the record. Do you have deposition testimony from the Gilbert detectives who testify that we regularly reviewed all these crime bulletins to see if the surrounding agencies were having a similar modus operandi to our robbery? Well, what I think the evidence would be is that they maintain a book, a crime book. Right. But I mean, how many robberies are we talking about in the greater Phoenix area? I'm guessing it's probably in the thousands. Oh, no. No, Your Honor. Armed robberies? Yes. Armed robberies? I have that information. I'm not talking just bank robberies. I'm talking about violent crimes that would generate crime bulletins that would be flying around, whether electronically or in flyer form in the mail, to a metropolitan area that is, what, 3 million people? Yes. I know that the FBI crime reports for Gilbert, I think they had 2,000, I think they had 36 total robberies, and only two of them were bank robberies. But these detectives were crimes against persons detectives, so they would have been representing far more or investigating far more than just bank robberies, would they not? Well, they would be investigating murders, which there were none in 2000, 2001. Assaults, right? There were, yeah, assaults, batteries would be part of a person's crime. Rapes? Rapes. There were 20 rapes or 36 rapes, something like that, in 2000, according to the FBI uniform crime statistics. So is your answer to my question, we don't have any direct testimony from any Gilbert detective who said, I reviewed the robbery flyers from surrounding jurisdictions and was aware of the Tempe and Mesa robberies as well as my own in Gilbert? I don't have any direct evidence of that. It would be inferential evidence, circumstantial evidence. So it would be based on evidence of custom and practice. Exactly. Okay. What else have you got? Well, we have the statistics that show how very few robberies there were, that this would have to have stood out as a rather astounding coincidence. Don't you love coincidences that a person happens to be five foot Hispanic, Hispanic females account for less than 1 percent of the robberies in Arizona across the board. Is there any testimony, again, by any Gilbert detective that he or she was aware of a robbery of banks in the surrounding suburban communities involving a Hispanic female similar in stature to the suspect in the first Gilbert robbery? I don't think we have any of that evidence, Your Honor. I guess that's the problem I'm having with the case, is I'm trying to determine what contested issues of material fact exist to warrant trial and whether you can even establish a prima facie claim against the local officers as opposed to FBI agent Richards, who I understand has settled out and is no longer in the case. Yes, that's correct. Well, I think that if you look at, I think it's page 49 of the opening brief, footnote 13, if I'm not mistaken. I find that I'm in agreement with appellants that Goldstein v. City of Long Beach, footnote 13, does correctly state the law regarding this sort of an incident. And in that case, the Court granted summary judgment on behalf of Long Beach Police Detective Wren, finding that he was neither an integral part or an active participant in the investigation at issue. But Judge Martz started his opinion saying nothing in this ruling augurs for a particular result for the other defendants. If we're to believe the news reports ---- It is an individualized assessment. Right. That's really what I'm focusing on. I understand the evidence that you have against Agent Richards, and had he not settled out of the case, this would be easy to say, no, you've got to stand trial based on your conduct. Sure. But I'm trying to focus and get you to focus on the evidence with regard to Sergeant McLaws and Detective Brock. And I'm trying to do that because what we know is the law has long been established that you can prove your defense that somebody else did it. And that was ---- that's made clear in the Court's ruling when he discusses Perkins as well as Smith v. Alameda. And in the Perkins decision, giving you an idea how far this doctrine goes back, it goes back to Armstrong v. ---- or U.S. v. Armstrong. And that's cited in Head Note 2 of Perkins, which is 937 F-1400. So if we know that similar M.O.s and similar suspect descriptions is good evidence ---- But it's the if we know part that I'm focusing on. And what is your evidence that these ---- this is an individualized determination that these detectives were willfully indifferent, which requires some mens rea of knowledge. And I guess your response to my question is we have to infer that they had knowledge from custom and practice. I don't have any direct admissions by a detective who says he or she knew a key piece of evidence, such as Jernigan was arrested and therefore couldn't have committed robberies four or five times. Well, let me address that. The arrest in this case was for two warrants. It was an arrest that was made for the Federal warrant and a warrant out of Gilbert. The Gilbert warrant was for some sort of malicious damage. And you'll find that ---- Is this a warrant that was outstanding from an unrelated case? Yes, unrelated. And was Detective Brock the investigator on that case or no? No, sir. But the Arizona crime system has a Maricopa County law enforcement judicial information system. It's the same as California's CLETS. It has all of your ---- all the warrant systems go into that. And so there was a Gilbert warrant, 00CR1901A. That was out there. And we know that Brock knew about that because we have a printout of her running that on September 22nd ---- I'm sorry, September 22nd, 2000. So what they tell you is ---- Well, that was seven days before the bank robbery. Did I say September 22nd? I thought I meant ---- You said September 22nd. The bank robbery ---- the bank was robbed on September 29th, was it not? Or have I got ---- September 20th. Robbery one was September 22nd. September 20th, okay. So I think it was the 22nd. I have it here. It's not part of the excerpt from the record. I can do a supplement if you'd like. So, counsel, I have a little different concern in reading Cowles and Youngblood. It appears that the Court has placed the onus on the prosecutor to turn over the evidence. And so I'm curious, what case in your mind clearly establishes that the investigator has an obligation to the defendant to turn over information as opposed to the prosecutor having that obligation? Could you help me with that? Sure. That's U.S. v. Bagley, Your Honor. U.S. v. Bagley. Did you cite that in your brief? Oh, yes. It's 473 U.S. 667. Well, I know that the cases say the fact that the information is held by the investigators as opposed to the prosecutors does not excuse it, but I'm curious as to where it says that the investigator has the obligation to turn it over as opposed to the prosecutor having the obligation to confer with the investigators and get the information. So what's the language in Bagley that you're relying on to say that the investigator has the obligation to turn the information over as opposed to the prosecutor having that obligation? Your Honor, I'm looking at my notes, and I may have misspoke. Bagley talks about the reasonable probability. And I know that there is a case. I am positive we cited it, but I know where there's another case that I didn't cite that I came across in my research, and that's U.S. v. McVeigh. I didn't see that. When I was reading Youngblood and when I was reading Cowes, it struck me that the obligation was placed on the prosecutor to get the information from the investigators and turn it over to the defendant. So I was curious as to whether there was something separate and apart that put the onus on the investigator to turn it over. And absent that, I'm not sure I can conclude that there was clearly established law that would prevent qualified immunity in this case. If there is a gap in our briefing, I would ask the court for leave to file a supplement, because I'm quite certain that there is that law. But I would go back to the McVeigh case. McVeigh? McVeigh. Timothy McVeigh. Uh-huh. The Oklahoma bomber. Counsel, can I address a particular point? I want to assume that there could be a fact-finding that the police knew, they knew that Jerrigan was arrested, et cetera. Here's a critical point, as I see it, when we get past all of those concerns. That is, she's arrested. Then there is the critical robbery, which is the number four robbery of the bank across the street from robbery number one. Bank one. Now, according to the plaintiff's evidence, McLaws is there on the scene as an investigator, and so is Richards. Correct? That's what you're saying. Well, we don't know whether McLaws was there in his declaration. He says he doesn't remember whether he was there, but clearly he was directing officers' behavior at the scene. Right. But the point is, he knows that Richards is there. So what is it that he hid from Richards? Because even if he knows, hey, he knows all the things we want him to know, doesn't he also know that Richards knows everything he knows at that point? Well, as Judge Tallman commented earlier, this is a concurrent jurisdiction case, and so we know that there's different qualities of investigators. In this case, Richards was a probationary FBI agent. It seems that he was also ethically challenged. If it's concurrent and if there is a joint responsibility, if you're an active participant or an integral part of an investigation and you're aware of exculpatory information, you're bound to disclose that to the prosecutor or to ensure that the prosecutor gets that.  Now, counsel, the concern is that if we can say that McLaws, and Brock probably fits in the same pattern, failed to tell Richards something, it was McLaws' opinion, assuming he had it, that, hey, there would be a Brady violation, in effect, if you don't turn this over. Now, do we put a burden on the local police to make that judgment and to tell the FBI agent, when they know the FBI agent knows all of the pertinent facts and hasn't made that call? I mean, how much do you want to put on the local police other than to say, case agent, there's responsibility, indeed, that person is going to be held liable for what happened? What else would you have wanted McLaws to do? Are you with Richards that based upon, at some point, Richards, you've got to tell the prosecutor? Well, I think that he could have done exactly what Sergeant Taylor did. Gilbert Sergeant Taylor saw a nexus between Robbery 1 and Robbery 2. He wrote a supplemental report after he interviewed Kerry Ward, the victim teller at Tempe, and he said, these are the same people that did these two robberies. You've got to connect the dots. That's part of what a policeman does. If this Court creates a subset that excuses officers because of their status, then I believe that the – you know, there's a slippery slope that is very dangerous. I'm out of – I'm really out of time. I'll let you go. We have plenty. I'll let you go. Counsel, I'm not – I'm not thinking about excusing anything. At least, I wouldn't use that term. What I'm thinking is, what did they do wrong when they didn't withhold any fact from the case agent? Well, I find that the Court's ruling didn't complete the circle. Judge Snowe said, I need not decide whether the law was clearly established, that they had a duty to impart this information to the prosecutor, but it was clear that they had to impart it to the FBI agent or his supervisors. I think that the completion of that analysis should have been, if those communications reasonably are calculated to reasonably ensure that it gets to the prosecutor, because Tennyson tells us that you can't just bury something in a report. And that would be what would happen with Sergeant Taylor's creating the nexus or drawing the nexus between Robbery 1 and Robbery 2. There was so many – But Tennyson involved San Francisco homicide detectives who were the investigators working with the DA's office in the investigation and prosecution of the murders. Sure. I mean, here – I mean, the question I think Judge Garbus is asking you is, knowing that Agent Richards is the bank robbery squad investigator from the FBI who handles all of these robberies, why wouldn't it be reasonable for Sergeant McLaws to assume, since he didn't withhold any information and they turned over copies of all their reports to Agent Richards, that Agent Richards would abide by his obligation as the case agent to bring any relevant information to the attention of the prosecutor? If there is an independent obligation to disclose Brady information, which we believe there is under the analysis that's set forth in Goldstein, which, incidentally, cites Tennyson as well as other Ninth Circuit cases, then that obligation is – cannot be delegated. It's an independent obligation, as you pointed out, for a concurrent investigation. Well, it's concurrent in the sense that the acts are a violation of both State and Federal law, but the prosecution was a Federal prosecution. And as a result, in essence, one sovereign decided or they agreed would handle the addressing the bank robbery, and the other sovereign stayed its hand and said, okay, if the FBI is taking this case, we've got other cases to work on and we'll assist as requested by the FBI. But it's not their prosecution. It's now a Federal prosecution. Yes, sir. And I think that does make a difference in distinguishing cases like Tennyson, where we're dealing with State investigators and a State prosecution. There's no question that the homicide inspectors in Tennyson had the obligation that Richards had to the Federal prosecutor. The question is, and this really is a case of first impression, I think, what do you do in this situation where there is concurrent jurisdiction, but a decision has been made to go Federally as opposed to State prosecution? Well, if you, going back to what I believe is a correct statement of law, if you're an active participant or an integral part of an investigation, you have a duty under Brady to disclose. Who has the duty, though? That's still my issue, is who has the duty to disclose? If you're in either one of those positions, an active participant, which Brock clearly was, or an integral part of the investigation, which is what McLaughlin was as the group supervisor for the person's crime unit. So they meet, each of them meet a prong of that analysis. What they tell you is, in their brief, is, but look at all of our evidence. There's uncontradicted evidence that we didn't know about this. Well, they haven't laid the proper foundation for that. But you think they were an integral part of the criminal investigation? Absolutely. McClaw's was, because McClaw's, if we just look at the robberies in the town of Gilbert, Robbery 1 is on September 20th, Bank of America. Robbery 6 is December 11th, 2001, same bank, same description. And they captured Lagos in that robbery. Then we have Robbery No. 4 on at Bank 1, point, you know, it's right across the street from Bank 1, I mean, from the robbery site of 1 and 6. You've got all these descriptors that are identical. Capture the person. You know what she looks like. Now, Brock is telling you, I don't even remember hearing about that. She's got a lot of I don't remembers. Well, but she took her deposition 10 years after the events in question. It's not this is sort of a classic example of why stale cases are difficult. Justice delayed is justice denied. And I realize your client spent 7 years in prison before we finally realized that maybe a mistake had been made. Sure. Yeah. But just going back to the I think it's important to make the point that if a party wants to use absence of an entry in a business record, they have to do so under 803. It really, counsel, what it sounds to me like, your theory of liability here is more deliberate indifference. And that's why I kept pressing you about what evidence do you have that they knew? I think it would be a very different case if the witnesses said, yeah, we sort of figured that maybe it couldn't have been Jernigan because the robberies continued. But we don't have anybody saying I even knew the date that she was arrested. That's the time these other robberies were being committed. Well, that was why I pointed out that there was a Gilbert warrant out that this is available in the criminal justice system. At the very latest, she knew that Jernigan was in custody when she testified at the hearing regarding the overly suggestive. February of what? February of 2001. 2001. That's at the very latest she would have known that. Now, she testified in that hearing, which I believe was on February 14th. That's the date that her report was done. And in her report, she doesn't mention anything about these other robberies. She doesn't mention anything about the Tempe robbery. The significance of that is that she's not But there's no evidence that she knew about the Tempe robbery, is there? Oh, yes, there is. In page 327 of the Let me get it real quick. I just read it a moment ago to you. And I apologize for fumbling on this. It's okay. It's an important case, and we want to make sure we understand the record. Okay. Thank you. Sergeant Taylor's report, Your Honor, that I had previously submitted to you. to. And it's Brock's statement in her report that Sergeant Taylor told her. This is about there was a question raised about the accuracy of our recitation in our brief regarding meeting with Sergeant Taylor, if you remember that. If you look at the excerpts that's cited there, and I, again, apologize. Oh, that's right. You asked her about that on deposition, and she basically said, I don't remember it, but if Sergeant Taylor said we had that conversation, I may reason to dispute. Whether they met together is irrelevant. The point is that she was aware of that. She was aware of the fact that Sergeant Taylor was drawing the nexus between Robbery 1 and 2, that these were the same perpetrators that did that. And when did this conversation allegedly occur? It would have taken place shortly after the 10-11-2000 robbery of the Bank of America in Tempe, because Sergeant Taylor's son was dating Kelly Ward, who was the victim teller in that bank. He took the surveillance photos, as well as the photo spread, showed them to Ms. Ward. Ms. Ward then told him, I think that the same person, the person shown for the robbery at the Bank of America in Gilbert is the person that robbed me. But the photo spread was shown to her, and she did not pick Jernigan out of that photo spread. Okay. And Jernigan was arrested on the 10th of October. Which, just as a total aside, that's the only time a photo spread was shown by a non-involved investigator, which is the doctrine that's now used by a lot of States, including North Carolina, that you don't have an involved investigator show the photo spread. The only time that was done, the victim says, oh, not the one. Okay. What a coincidence. All right. I've let you run over. I'm going to give Ms. Alvarado some extra time to compensate, but unless the panel has any further questions. The excerpt record regarding Sergeant Taylor is 387. I'm sorry, 307? 387. 387. Okay. Thank you. Sorry, I couldn't figure it out. No, thank you very much. It was right in front of me all the time. That's okay. I understand. I've been there myself. I appreciate it. Thank you for your argument. Ms. Alvarado. This issue about the Tempe robbery, Your Honor, has nothing to do with anything. Darnigan was charged with the Tempe robbery. She was charged with robberies 1, 2, and 3, and she actually moved to sever the trial so that when she was tried, she was only tried on charge 1. So this big – there's no mystery about 1, 2, and 3, because she knew about all those because she was charged with all of them. So is your response to Mr. Barham's argument that, okay, if Sergeant Taylor had that conversation with Detective Brock, she was ultimately indicted for that robbery, and he'd connected the dots, saying, I think that the person who committed the first robbery also committed the third robbery? No. Sergeant Taylor was questioning whether there was a connection between robbery 1 and 2. And so he went and showed this lineup to his son's girlfriend, and then came back to Detective Brock and told him what he had done, and she said, do a report. Whatever you did, put it in a report, and all of that went to the FBI, and all of that went to the prosecutor, and of course, like I said, Darnigan was charged with all this crime. And is there any evidence in the record that Sergeant Taylor knew that Darnigan had been arrested on October 10? I don't believe there's any evidence in the record concerning that. So when he had that discussion with her after the second robbery on the 11th of October, he wouldn't have had any reason to doubt that they were dealing with the same person? Correct. I think it was more just he was probably acting as a father and seeing his son's girlfriend upset, and he just kind of took it upon himself to do some work when he may or may not have been supposed to. I don't know. But the point is, I guess I really don't understand what the point is, because Darnigan was charged with 1, 2, and 3, and those plaintiffs said it. Well, I think the point is that the plaintiff has to show, either inferentially since they don't have a direct admission by any of the defendant detectives, that somebody knew that Darnigan had been arrested on October 10, and therefore could not have committed robberies 2, 3, 4, 5, and 6. It had to be a different person. No, no. She was not arrested until after the commission of the third robbery. I thought she was arrested on the 10th of October. Right. November. Oh, November. All right. Okay. Yeah. She was at large. And again, part of the difficulty is she's a transient, so she had no, you know, residence that they could locate her. They were talking to her husband. He didn't know where she was. Right. So she was unaccounted for during the commission of robberies 1, 2, and 3. She was arrested. She was charged and indicted on counts 1, 2, and 3. And then while she was in custody, 4 and 5 happened. Just I want to respond to the comment about what Senator McLaws knew about number 6. Again, that's a red herring, because the prosecutor knew that as well. And then there was a connection.  The prosecutor knew that it was a connection, and that's why, in the case of AUSA Morrissey, he actually asked for Juanita Gallegos's print, the perpetrator of number 6, to be run against the print that was found on the scene at robbery number 1. So he made a connection. The prosecutor made that connection at the time. There was no match. The prosecutor didn't do anything. He didn't disclose it to the defense at that time. That raises an interesting question, particularly in light of Judge Kaczynski's dissent in Olson. Now, the prosecutor knows about 6 and the connection. But, of course, that's after the trial. It's too late to do anything in terms of a Brady discussion. But it gives some credence to the fact that if the prosecutor had been told of what she knew about 6 with regard to number 4, maybe she, and nobody accuses her of doing anything wrong, she would have made the disclosure and we wouldn't have a problem. Yeah. I mean, I think at that point it's speculation, Your Honor. I mean, obviously, at the time that Jarnigan went to trial, 4 and 5 were simply unsolved crimes. There was no arrest. There was no suspect at that time. They were just simply open, open investigations, essentially. I do want to comment that this, that this could be true. But I'm assuming that the prosecutor didn't know about number 4 at all, whether it was an unsolved crime or not. And maybe I'm way off base, but the prosecutor did in 2002 seek to find the connection between the perpetrator of number 6 and number 1, the St. Doren Bank, for instance. Yeah. I think the – well, again, I don't want to speak for the prosecutor of this case. I mean, I understand from the briefing below that the prosecutor took the position that at the time of Jarnigan's trial, he didn't know about 4 and 5. But certainly by the end of 2001, when Gallegos was arrested, you know, caught red-handed, and she was immediately indicted for 4, 5, and 6, that he did know at that time. And then he investigated whether there was a connection between Gallegos and number 1, found that there was no physical connection in terms of a print, and so he didn't do anything further at that point. Well, but I – I mean, it is good to have a debate about things. That tends to lead to the support that that knowledge could have been used to raise a reasonable doubt in the jury, because that knowledge was enough to make the prosecutor do an investigation that might have cleared Jarnigan. Had – Well, the prosecutor did an investigation, found that there was no match, didn't believe the women looked alike, and didn't do anything more. Obviously, I think the published Jarnigan decisions say exactly what you just said, Judge Garib, as well. There could be reasonable doubt, and it falls into what her defense was, which is mistaken identity, and the only evidence against me is eyewitness identifications. And he's got five eyewitnesses who have picked Jarnigan out of the photo montage. Correct. Was there some reason why there were no lineups conducted in these robbery investigations? I have no idea. Did they just not do them on a routine basis at the time? I don't know. I don't know any of that information. Anyway, what counsel said during his comments about that Detective Brock ran or searched for an arrest warrant that had been issued by the town of Gilbert, that's the first time I've heard of that. I don't believe that's in the record, Your Honor. I think he indicated it's not in the excerpts of record, but I'm not sure. Or in the record before the district court. So he said, yeah, he assigned you to some database somewhere. And as I understand it, it was for a totally unrelated crime. So I mean, the fact Correct. I mean, Ms. Jarnigan had a very extensive criminal history. It's The fact that she got booked on a Federal arrest warrant and is being held, and then they discover that there's also an arrest warrant outstanding for some other State crime. Okay. Fine. What I want to just, I guess, close with is when we're talking about the contours of the right, and it has to be particularized to this context, here we are in 2014. And I don't know what I would tell my clients about what they're supposed to do in the future. Because according to what the district court said, the district court said, you have to independently raise the distinctive similarities between separate criminal incidents with the FBI, who, by the way, already knows all of that, in order to discharge your Brady violent duty. Well, I think if Mr. Barham were able to answer your question, I think he would say that the detectives had an independent obligation to dig deeper when they realized that there were other crimes being committed by a Hispanic female, which is a pretty unusual bank robbery suspect, even in Phoenix, Arizona. And they should have braced Agent Richards and pushed him to make sure that he had disclosed to the U.S. attorney the fact that there were possibly two, or that the bank robber might be the same, or there might be another robber who looked similar to this robber committing robberies, and to make sure that information got turned over to the defense. I think that's their theory. I think from the outset, it's been my position that the plaintiffs have made this a negligent investigation case. And I've argued that from – continually, that since we're talking about Brady, which is a fair trial right, this is not a malicious prosecution, this is not false arrest. This is a fair trial right, which by definition arises when there's a prosecution. And here there's a Federal prosecution. That everything they've argued has been negligent investigation. In their answering brief, they said, you can't just do a report, and you can't just give those reports to the FBI. You have to have this analyze it and discussion and debate. And that's my question. So to the – to my clients, when I say, is a phone call enough? Does it have to be an in-person meeting? Does both Brock and McClaw's have to do it? So just one – how can we say this is clearly established when I don't even know what the contours are today? How do you distinguish our decision in Tennyson from this case? Well, first of all, on a couple of bases. First, Tennyson involved the case agents, which is a very important distinction. The case agents who were involved in the actual prosecution and even involved in the post-conviction relief proceedings. And second of all, and as Tennyson I think on its facts talks about, that was involving patently exculpatory evidence. It was a Mirandized confession by someone who gave significant details about the case, that you would – that you could say any reasonable officer would know that if somebody else confesses to the crime and gives enough detail that you'd say, wow, that – he had to get that information from somewhere, that that is exculpatory. And that was not turned over to the district attorney until later, is that correct? Right. Until the post-conviction relief stages. The fact that someone else had confessed to the murder. Correct. So unlike our situation where all of the Gilbert reports were turned over, in Tennyson, SFPD homicide withheld information. Right. What's at issue here is it's not that information wasn't turned over to the FBI, which is what the district court said was the Brady duty. What he's saying is this – you didn't make these inferences. You didn't make this – have this debate. You didn't have this discussion with the FBI about it. And that's what I think is new. I mean, if that's going to be the law in the circuit, it needs to be set forth in a case that's unambiguous and that states an unequivocal statement of the law that certainly was not the case law, the status back in 2000 and 2001. I think we pretty well exhausted the subject. Yes. I guess this is the advantage of not having anything else behind us. I don't think we have any further questions. I want to thank you all for a very helpful argument, and we'll get you an answer as soon as we can. I just want to make a correction. Sure. I told you that I believe that that warrant was run by – Well, let me ask you. Was this information before the district court or not? Because if it wasn't, then – We put a whole bunch of stuff in that I don't know whether it made it in the excerpt record, but the date was 925. I have the – When she ran the – okay. But you're not sure the district court was even aware of that either. I can check that. And if you'd like, I'll file a letter. That would be great. Yes. Why don't you do that? You can just do it by letter. And if I can also add an answer to Judge Rawlinson's question about the obligation of a police officer to make the disclosure, if I may do that also. All right. That's enough. We are adjourned.
judges: Garbis, Tallman, Rawlinson